# EXHIBIT A

**JAMES R. ELLIOTT, ESQ.**
Attorney for Plaintiff
Identification No. 78224

**LAW OFFICES:**
**142 South Main Avenue**
Scranton, Pennsylvania 18504
Phone: (570) 342-8200
Fax: (570) 342-7786

| | |
|---|---|
| JAMES R. ELLIOTT | : IN THE COURT OF COMMON PLEAS |
| | : LACKAWANNA COUNTY |
| vs. | : CIVIL ACTION |
| PENNSYLVANIA INTERSCHOLASTIC | : |
| ATHLETIC ASSOCIATION, INC. ("PIAA"), | : NO. 2019 – 1946 |
| FRANK MAJIKES, individually and in his | : |
| capacity as PIAA Representative, WILLIAM | : |
| SCHOEN, individually and in his capacity as | : |
| PIAA Representative, and | : |
| LUKE MODROVSKY, | : JURY TRIAL DEMANDED |
| Defendants. | : |
| | : |

### PLAINTIFF'S COMPLAINT

1.      Plaintiff, James R. Elliott ("Elliott") brings this action against the defendants who have retaliated against him and infringed upon his constitutional rights to free association and free speech as guaranteed under the First and Fourteenth Amendments of the United States Constitution and Article I Sections 7 and 20 of the Pennsylvania Constitution, as well as his rights guaranteed under the PIAA Constitution, Policies and Procedures.

2.      Defendants PIAA, William Schoen and Frank Majikes retaliated against Mr. Elliott solely because he chose to support a candidate other than Defendant Schoen for PIAA Official's Representative.  Mr. Elliott asked Schoen to stop retaliating against him but Schoen refused. Therefore, Mr. Elliott ran against Schoen in the next official's representative election.  During the election, Defendant Luke Modrovsky, a supporter of Mr. Schoen, viewed the results of the election and provided updates to Schoen and/or Schoen supporters so they could strategize and hurt Mr. Elliott in violation of Mr. Elliott's rights. After the election, PIAA, Schoen and Majikes

1

continued to retaliate against Mr. Elliott due to his running against Schoen for official's representative.

3.      James R. Elliott ("Elliott") is an adult individual residing in Scranton, Pennsylvania, which is located in Lackawanna County.

4.      Defendant, Pennsylvania Interscholastic Athletic Association, Inc., ("Defendant PIAA") is a Pennsylvania organization doing business throughout Pennsylvania, including Lackawanna County, with offices located at 550 Gettysburg Rd, Mechanicsburg, Pa.

5.      Defendant, Frank Majikes, is an adult individual residing in Luzerne County, Pa. Majikes, is the PIAA District 2 Committee Chairman, and serves as Vice President of the PIAA Board of Directors.  He also is paid by PIAA Member schools in Luzerne County to assign their regular season basketball games.

6.      Defendant, William Schoen, is adult individual residing in Lackawanna County, Pa. Schoen is the PIAA District 2 Official's Representative and member of the PIAA District 2 Committee.  As Officials representative, he is responsible for assigning officials to work PIAA district playoff games in all sports as well as recommending district 2 officials to the PIAA to work state playoff games.  He is also paid by PIAA member schools in the Lackawanna League to assign regular season football games.

7.      Defendants Majikes and Schoen are members of the District 2 PIAA Committee, are representatives and agents of the PIAA, and at all times herein were acting in their capacity as representatives of the PIAA.

8.      Defendant, Luke Modrovsky, is an adult individual residing in Luzerne County, Pa. Modrovsky is a PIAA sports official whom both Majikes and Schoen assign games.  Additionally, Modrovsky was recommended by Majikes to serve a 2018 summer internship in the official's department at PIAA Headquarters, Mechanicsburg, Pa.

9.      This action is brought against the individual defendants in their individual and official capacities.

10.     Venue is proper in this Court because contacts giving rise to the claims occurred in Lackawanna County.

11.     Defendant PIAA was formed by a group of high school Principals who desired to eliminate abuses, establish uniform rules, and place interscholastic athletics in the overall context of secondary education.

12.     The "purpose and function of PIAA is to develop and enforce rules, which are authorized or adopted by the member schools, regulating interscholastic athletic competition."

13.     For administrative purposes, the PIAA is divided into twelve (12) geographic districts. Each district has a District Committee that is elected by the member schools within that district. Each district then elects a chairman, who becomes the district's representative on the PIAA Board of Directors, which is the governing body of the PIAA.

14.     PIAA District 2 includes the counties of Northeastern Pennsylvania.

15.     To perform the services and achieve the goals of uniform performance of athletics, PIAA employs sports officials.  PIAA could not fulfill its purposes or operate its work without sports officials since having a pool of officials is a primary service PIAA provides its member schools.

16.     Upon information and belief, PIAA has approximately 16,000 registered sports officials.

17.     After passing a PIAA rules test, PIAA requires all officials to join a local PIAA chapter of officials in their respective sport.

18.     Mr. Elliott has been a registered sports official with PIAA since 1998, officiating basketball, football and baseball.

19.     Mr. Elliott is a member of the Scranton basketball chapter, Lackawanna County baseball chapter, and the Wyoming Valley football chapter.

20.     PIAA also requires all sports officials to pay annual fees to the PIAA for each sport he/she officiates, as well as paying annual fees to their local PIAA officiating chapter.

21.     In addition to paying the annual fees to the PIAA and local chapters, approximately $250, Mr. Elliott incurs additional expenses, in excess of $1000, on items such as insurance, uniforms, conventions, books and training DVDs, and off-season officiating clinics.

22.     PIAA requires officials to attend a mandatory rules meeting, and attend at least six (6) chapter training meetings during the year for each respective sport.

23.     Since 2013, Mr. Elliott has been selected by his peers to serve as Rules interpreter for the Scranton Chapter of Basketball Officials, and, therefore, Mr. Elliott is the instructor at these training meetings.

24.     If an official wants to be eligible for post-season playoff assignments, he/she must attend the PIAA Convention once every five years.

25.     Mr. Elliott has attended every PIAA Officials Convention since 2010, as well as being asked by PIAA to be a speaker at the PIAA Convention in 2016.

26.     Mr. Elliott has worked district championships and state playoff games in all three sports he officiates, including the 2012 PIAA Basketball Championship Final, 2014 PIAA Baseball Championship Final, and 2016 6A PIAA Football Quarterfinal game.

27.     Mr. Elliott is also a National Collegiate Athletic Association ("NCAA") men's basketball official since 2001, officiating at the Division II, Division III, and junior college levels.

28.     PIAA acknowledges, as do his assignors, that Mr. Elliott is a very good official in each of the three sports he officiates.


**I.      Elliott v. PIAA, Schoen and Majikes**

29.     Mr. Elliott incorporates by reference the averments contained above.

30.     Mr. Elliott had been assigned district finals and state playoff games for many consecutive years but that changed in 2017 when Defendant Schoen began retaliating against Mr. Elliott after his brother ran against Schoen for PIAA District 2 Official's representative.

31.     In December 2016, Dave Elliott, Plaintiff's brother, ran as a candidate against Schoen for the position of PIAA District 2 Official's representative.

32.     In January 2017, PIAA declared Schoen winner in a close election.

33.     Mr. Schoen took great offense that David Elliott opposed him in the election as contested elections for PIAA official's representatives are rare.

4

34.     Schoen was public in his anger, rebuking supporters for not standing up for him at official's meetings when officials complained or recommended an opponent to run against him.

35.     In or about February 2017, Schoen called a special meeting for some supporters, mostly football officials, to express his anger against non-supporters and even claimed his "family" was hurt due to the election.

36.     Thereafter, Mr. Schoen took his retaliation out on Dave Elliott's "family".

### (A) Mr. Elliott's sister

37.     In February and March 2017, Mr. Elliott's sister, Kim Cwalinski, who had been used by Mr. Schoen for years as event personnel and "ticket-taker" at PIAA playoff games, was no longer hired to work playoff events.

### (B) Mr. Elliott's brother

38.     In September 2017, Dave Elliott was forced to transfer to the Wyoming Valley Football Chapter due to retaliation in football assignments by Mr. Schoen.

39.     Other Lackawanna League officials have also been forced to transfer to the Wyoming Valley Football Chapter as a result of Mr. Schoen's retaliation.

### (C) District Interpreter

40.     Mr. Elliott had served as the basketball interpreter for the Scranton Chapter since 2013 through today, and prior to that he served as assistant interpreter.

41.     During the relevant four years (2013-2017), Schoen was a member of the Scranton basketball chapter and attended the meetings led by Mr. Elliott.

42.     Mr. Elliott used video clips to teach rules, interpretations and game management skills.  Mr. Elliott was the only basketball interpreter in district 2 to train officials with video.

43.     Mr. Elliott attended off-season officiating clinics and would bring back what he learned from those clinics to train the local officials.

44.     Mr. Elliott also brought in speakers, including Ed Rush, a former NBA referee, NBA Supervisor of Officials, and Pac 12 Supervisor of Officials, to give guidance and training to the basketball officials in the Scranton Chapter and District 2.

45.     Schoen informed Mr. Elliott that he was impressed with the training meetings.

46.     Schoen informed Mr. Elliott on numerous occasions that if the District 2 Basketball Interpreter position ever became available, Mr. Elliott would be the person he would appoint to the position because he believed Mr. Elliott was very qualified and he wanted to incorporate video to train officials throughout District 2.

47.     In or around August 2017, the District 2 Basketball Interpreter position became vacant as a result of the resignation of James Gross.

48.     Upon his resignation, Mr. Gross informed Mr. Elliott that he will be recommending to Schoen that Mr. Elliott be appointed his successor.

49.     Mr. Elliott emailed Schoen that he was still interested in the position and included an officiating resume for his review.

50.     In September 2017, the PIAA Mandatory State Meeting for all Basketball Interpreters was held but Schoen did not appoint the District interpreter in time for the meeting so no one attended the meeting on behalf of the district.

51.     In and around October 2017, all of the local basketball chapters in District 2 held their Mandatory Rules Interpretation meetings, yet, Schoen still had not appointed a district interpreter.

52.     Officials were asking questions about rules and interpretations throughout the District, and other interpreters were relying on Mr. Elliott for rule interpretations.

53.     Officials in the district were complaining about the lack of district interpreter.

54.     Schoen was ignoring requests for updates on the selection of district interpreter.

55.     On or about October 29, 2017, Mr. Elliott approached Schoen at a football meeting to get an update on the vacant position.

56.     When approached for an update, Schoen tried to avoid Mr. Elliott and claimed he hadn't even thought about the vacancy despite the basketball season under way.

57.     In November 2017, schools were practicing, scrimmaging, and the season was soon to start yet Schoen had not selected the interpreter.

58.    The Scranton Basketball Chapter sent a letter to Schoen requesting he appoint a district interpreter and recommended Mr. Elliott as there were rumors that Schoen didn't want to select Elliott because his brother ran against him for official's representative.

59.    The 1st game of the high school season started and there was still no district interpreter.

60.    In December 2017, Schoen recommended Bruce Weinstock to be the District Interpreter and the PIAA appointed him for the position.

61.    When Mr. Elliott asked Schoen what had changed after four years of telling him that he would like Mr. Elliott to be the district interpreter, Schoen repeatedly changed his answers.

62.    First, Schoen claimed he had nothing to do with selecting the interpreter and tried to blame the PIAA and Pat Gebhart, PIAA Assistant Executive Director, who is in charge of the officials for the PIAA, for not selecting him.

63.    Schoen's claim that he had nothing to do with the selection of the district interpreter was untrue since Schoen is required to recommend the district interpreter to the PIAA, and PIAA always accepts the recommendation of the district official's representative.

64.    Schoen then claimed it was not his really his decision, instead, a committee consisting of Mr. Majikes, Schoen and Maureen Williams made the decision.

65.    Schoen claimed the committee felt it would be best to have an interpreter who had no experience as an interpreter, but he declined to explain his reasoning.

66.    Schoen then instructed Mr. Elliott that he needed to "wait his turn" but Schoen also declined to explain what that meant.

67.    Schoen also now opined that he believed Mr. Elliott was not qualified to be district interpreter and he was offended that Mr. Elliott would dare to question his judgment in officiating matters.

68.    Mr. Elliott then asked Mr. Majikes about the decision to appoint the district interpreter since Schoen alleged Majikes was involved in the interpreter decision.

69.     Majikes is a friend and supporter of Schoen's re-elections, as well as Schoen's boss on the PIAA District 2 Committee.

70.     Initially, Majikes also claimed he had nothing to do with selecting the district interpreter.

71.     When I informed him that Schoen had already admitted there was a committee formed to select the district interpreter, Majikes changed his answer.

72.     Majikes now claimed that he selected Mr. Weinstock because he was an official the longest.  When Elliott asked if that was the only reason, Majikes stated yes.

73.     Mr. Elliott asked why do you need a committee and take so long to pick an interpreter if the critical factor for the position was time of service but Majikes did not respond.

74.     Mr. Elliott asked why Rudy Kasarda wasn't picked interpreter since Mr. Kasarda was an official longer than anyone in District 2 but Majikes did not appreciate being asked questions regarding his judgment so the conversation ended abruptly.

75.     Notably, Weinstock had been an official longer than the previous interpreter, Mr. Gross, when Mr. Gross was appointed district interpreter, and there were many officials who had been official longer than Gross when he was appointed district interpreter.

76.     Years as an official has never been the reason to select an interpreter in District 2 or the PIAA in any sport.

77.     In December 2017, Weinstock spoke to the Scranton Chapter of basketball officials and confessed, "I don't know why I was selected because I didn't apply for the job."

78.     In fact, Mr. Elliott was the only official who applied to be the district interpreter.

79.     Mr. Elliott was highly qualified for the position of district interpreter.

80.     Mr. Elliott knows the rules better than, or as well as, any official in District 2.

81.     Schoen and Majikes intentionally retaliated against Mr. Elliott by not recommending him to be the district interpreter solely because his brother ran against Schoen for official's representative.

82.     Schoen and Majikes approached several officials to ask if they would be interested and it took months to find an official of their liking for the position.

8

83.    On or about January 4, 2018, one of Schoen's best friends, Chris Thomas, acknowledged to Mr. Elliott in a phone conversation with Mr. Elliott that Schoen didn't appoint Elliott for Interpreter because his brother opposed Schoen in the election.

84.    Schoen conspired with Majikes to retaliate against Mr. Elliott to ensure Mr. Elliott would not be selected district interpreter.

85.    Schoen and Majikes gave pretextual excuses in an attempt to hide behind their retaliation against Mr. Elliott.

### (D) 2017 Football Playoffs

86.    Schoen is responsible for assigning officials to regular season games as well as district playoffs and recommending officials for state playoffs games.

87.    Prior to 2017, Schoen had assigned Mr. Elliott a full schedule of regular season games, district championships and recommended Mr. Elliott be assigned state playoff games every year he was eligible for playoffs, approximately ten years.

88.    In or about 2014, Schoen informed Mr. Elliott that he considered him to be one of the better football officials in the chapter and elevated Mr. Elliott to the position of Referee, which is the lead official on a football crew.

89.    In 2016, Schoen recommended Elliott to work the state football playoffs, and PIAA selected him to work multiple playoff games, including the PIAA 6A quarterfinal game.  Elliott and the crew received very good evaluations from their evaluators as well as a recommendation to be considered for advancement to semi-finals or championship.

90.    In 2017, the year after the election, rumors were circulating that Schoen wasn't going to recommend Mr. Elliott and a few others, whom he believed supported Dave Elliott in the election, for state playoff games.

91.    Mr. Elliott attempted to contact Schoen to inquire whether he was going to get a state playoff game as he has had for many years prior but was ignored.

92.    As he had for all the years prior, Mr. Elliott cleared his schedule and refused higher paying basketball games for the anticipated football games that he had always been assigned in the past.

93.     However, Schoen continued to retaliate against Mr. Elliott and he did not get a state playoff assignment for the first time.  Schoen also retaliated against other quality officials whom he believed did not support him in the election.

94.     Mr. Elliott attempted to contact Schoen to ask the reason why he and others didn't get a game while other crews in the district received multiple games but was ignored.

95.     When others who were retaliated against asked Schoen why they weren't selected for a playoff game, Schoen claimed ignorance and blamed Pat Gebhart.

96.     Officials were so upset they called Pat Gebhart to complain and Gebhart informed them that Schoen was to blame.

**(E)  Forced to transfer to Wyoming Valley Football Chapter**

97.     If an official has a problem with an assignor, he is required to go to his official's representative, who will attempt to assist the official in trying to resolve any issue involving the assignment of games.

98.     When the assignor is also official's representative, there is a conflict of interest.

99.     Mr. Elliott asked Schoen why he was retaliating against him but Schoen claimed it was merely a coincidence, not retaliation.

100.     Mr. Elliott was forced to choose between staying in the Lackawanna chapter where Schoen was the assignor and continue to suffer more retaliation, or "coincidences," or transfer to a new chapter in another county where he did not know the assignor and may not receive games.

101.     Other Scranton chapter officials who suffered from Schoen's coincidences were forced to transfer and chose the Wyoming Valley Football chapter.

102.     For example, Jim Miller, who is a NCAA football official and very good high school official, was forced to transfer to Wyoming Valley chapter to avoid further retaliation by Schoen.

103.     When Schoen learned of Mr. Miller's transfer, he called Sandy McKay, assignor of football games in the Wyoming Valley at the time, and asked McKay for a favor and not give Miller any games, but McKay declined Schoen's request.

104.    In August 2018, due to the persistent retaliation from Schoen, Mr. Elliott was forced to transfer to the Wyoming Valley football chapter.

**(F) 2018 Football Playoffs**

105.    During the 2018 regular season, Russ Davis, who was the new assignor in the Wyoming Valley Conference, gave Mr. Elliott a full schedule of games, including several games as a Referee.

106.    However, Schoen, the official's representative, again retaliated against Mr. Elliott in preventing him from getting state playoff games by not listing him on the recommended list of officials from District 2.

**(G) 2018 Nomination to be placed on the ballot**

107.    Upon learning that he was again prevented from receiving playoff assignments, Mr. Elliott demanded Schoen to stop retaliating against him and other members of his family.

108.    Schoen again claimed it was merely another coincidence that Mr. Elliott was not recommended for 2018 state football playoff games.

109.    Schoen also claimed it was also a coincidence, and not retaliation, that Dave Elliott was not receiving state playoff games.

110.    Schoen also claimed it was another coincidence that Mr. Elliot's sister no longer worked playoff events.

111.    Fearing more retaliation if Schoen remained official's representative, Mr. Elliott decided to run against Schoen for the position.

112.    PIAA requires a local chapter to nominate any opponent who intends to run against the current official's representative.

113.    To prevent Mr. Elliott from being nominated, Schoen began attending every meeting of the Wyoming Valley Football officials to prevent the chapter leaders from nominating Mr. Elliott.

114.    Post-election, Schoen has not attended any meetings of the Wyoming Valley Chapter in 2019.

115.     Schoen also met privately with the Wyoming Valley football chapter leaders to request that their Board of Directors nominate Schoen to stay as official's representative instead of Mr. Elliott.

116.     Schoen would take the chapter leaders out for drinks and assign them games in Lackawanna County to garner their support for his re-election as official's representative.

117.     The Wyoming Valley Football Board members are active officials who must rely on Schoen to get playoff games and Mr. Elliot did not know the chapter leaders well enough, being new to the chapter, so Mr. Elliott did not believe he would get their nomination to run against Schoen.

118.     Instead, Mr. Elliott asked the Board of Directors for the Scranton Chapter of Basketball Officials to nominate him to run against Schoen for official's representative, and the Board agreed with only Schoen's close friend opposing the nomination.

119.     When Schoen learned that the Board of Directors for the Scranton Chapter of Basketball officials nominated Mr. Elliott, Schoen was furious.  Schoen traveled to Scranton High school where the board members were meeting and expressed his anger to board members as well as Mr. Elliott.  Schoen also contacted Board Members on the phone to express his anger at their perceived betrayal.

**(H) 2018 Election for Official's Representative**

120.     During the election, Defendant Luke Modrovsky intentionally accessed Survey Monkey and viewed the PIAA District Official's representative election.

121.     Modrovsky monitored the election and informed officials whom he believed supported Schoen of the up-to-date election to assist Schoen in getting re-elected.

122.     Upon information and belief, Modrovsky informed Schoen and/or Majikes the up-to-date election results to use as they deemed fit to show his support for Schoen and get Schoen re-elected.

123.     Upon information and belief, the defendants conspired to interfere with the District 2 official's representative election and harm Mr. Elliott.

124.     The defendants had no privilege or justification to interfere in the election.

12

125. The defendants' actions were intentional, malicious, outrageous, arbitrary, and capricious toward the rights of Mr. Elliott in having a fair election.

126. As a result of defendants' intentional actions, and violation of Mr. Elliott's right to a fair election, Mr. Elliott suffered damages.

**(I)  2019 Basketball Playoffs**

127. Soon after the election, the 2019 District 2 Basketball Championships were held at the Mohegan Sun Arena.

128. Joseph Ross, the assignor for basketball officials in the Lackawanna League, considers Mr. Elliott to be one of his best officials in the Lackawanna League and District 2.

129. During the 2018-19 regular season, Mr. Ross assigned Mr. Elliott a full schedule of games and listed him as the Referee, the lead official in the crew, on every game.

130. According to Schoen, even though he is responsible for selecting officials for district playoffs as the district official's representative, he does not get involved in selecting officials for playoffs in basketball. Instead, he delegates the assignments to the two conference assignors who know their officials best.

131. Therefore, Schoen delegated the responsibility of selecting officials for district playoffs and finals to Joe Ross and Frank Majikes. If an official was needed from Lackawanna League, Mr. Ross would select the official; and, if an official was needed from the Wyoming Valley League, Mr. Majikes would select the official.

132. Majikes stated he would only object to a specific official from the Lackawanna League if he learned that the official had a conflict of interest with a school, which was very rare.

133. Before the playoffs begin, officials list any schools where there is even an appearance of a conflict of interest, so Mr. Ross would know if any of his officials had a conflict of interest with a school.

134. Mr. Elliott did not have a conflict of interest with any of the ten schools involved in the finals.

135. Yet, Majikes blocked Mr. Ross from assigning Mr. Elliott to any of the District finals.

13

136.    Majikes blocked Mr. Elliott from working the district finals to retaliate and intentionally harm Mr. Elliott for running against Mr. Schoen.

137.    Elliott complained to Mr. Ross about the retaliation but Ross sated there was nothing he could do.

138.    Despite only being delegated authority to select officials from the Wyoming Valley Conference, Majikes claimed he has the absolute right to select all officials who work the district finals.

139.    Majikes claims that his vote is the only one that matters when assigning officials.

140.    Majikes' belief that he has dictatorial authority to select whomever he wants for the district finals violates the authority that Schoen delegated to Majikes and Ross.

141.    Majikes' belief that he has dictatorial authority violates PIAA Policy and Procedures to assign officials based on merit and equal treatment of officials.

142.    Majikes' belief that he has dictatorial authority also violates Majikes' own policy that he will objects to an official selected by Mr. Ross if the official has a conflict of interest with a school.

143.    When asked if he blocked Mr. Ross from assigning Mr. Elliott to the District Finals, Majikes claimed he could not recall.

144.    Even though he claimed he could not recall blocking Mr. Elliott from the District Finals, Majikes later stated he was justified in not allowing Mr. Elliott to work a District Final because he believed Mr. Elliott is not a good official.

145.    Notably, during Majikes' brief tenure as assignor of NCAA games, he ranked Mr. Elliott as one of the better officials on his staff, with a rank as high as #3, and assigned Mr. Elliott to the NCAA MAC Conference playoff game.

146.    Additionally, Mr. Elliot had officiated approximately fifteen (15) consecutive District 2 Championship games and/or 3rd place consolation games.

147.    When asked why he suddenly believed that Mr. Elliott was a substandard basketball official, Majikes claimed to have witnessed Mr. Elliott officiate a NCAA game in 2019 and did not believe he was good.

14

148.     When asked to be more specific about a games that occurred a few months ago, however, Majikes could not remember in what city the game was played, could not remember the teams that played, could not remember the officials who worked in the game with Mr. Elliott, could not remember any calls Mr. Elliott might have missed in the game, could not recall any perceived demeanor Mr. Elliott exhibited that caused Majikes to take offense, and couldn't recall anything in the game that justified changing his assessment of Elliott as a competent official.

149.     Majikes admitted that he did not contact Mr. Elliott to address the alleged concerns he had after watching him officiate the game, nor did Majikes give Mr. Elliott an opportunity to correct any deficiency Majikes thought Mr. Elliott exhibited; instead, Majikes used this one NCAA game to punish Mr. Elliott at the high school level, despite considering Mr. Elliott a very good official for the prior fifteen consecutive years.

150.     Majikes did not see Mr. Elliott work any high school or NCAA game in 2019.

151.     Majikes' excuse that Mr. Elliott is not a good official is pretextual and an attempt to justify his retaliation against Mr. Elliott.

152.     This is not the first time Majikes has retaliated against officials whom he believed were against him and/or Mr. Schoen.

153.     Majikes retaliated against Michael Amory, a NCAA and PIAA basketball official, who was forced to transfer to the Scranton Basketball chapter in 2018-19 to avoid more retaliation from Majikes.

154.     Majikes also retaliated against Mr. Amory in 2019 by removing Amory from district playoff game that Ross had assigned him.

155.     The PIAA and its representatives are state actors.

156.     Mr. Elliott has a constitutional right to freedom of speech and freedom of association.

157.     Mr. Elliott has a right to be free from retaliation as guaranteed by the PIAA Policies and Procedures.

158.     PIAA, its representatives, Schoen and Majikes, retaliated against Mr. Elliott for exercising his right to freedom of speech and freedom of association.

15

159.    The reasons given by PIAA, Schoen and Majikes for retaliating against Mr. Elliott are pretextual.

160.    The actions by PIAA, Schoen and Majikes against Mr. Elliott are outrageous, arbitrary, capricious, and malicious.

161.    As a result of the actions of PIAA, Schoen, and Majikes, Mr. Elliott suffered damages, financial losses, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

162.    Mr. Elliott is entitled to damages, as well as punitive damages as a result of the actions of the PIAA and its representatives, Majikes and Schoen.


**II.      Elliott v. PIAA, Majikes and Schoen**

163.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

164.    The actions of the PIAA and its representatives, Majikes and Schoen, to retaliate against Mr. Elliott were done willfully, maliciously and without legal justification or excuse.  The actions were done solely with the intent to harm Mr. Elliott.

165.    The actions of the PIAA and its representatives, Majikes and Schoen, were outrageous, arbitrary, capricious, malicious and in violation of the state and federal law as well as the PIAA Constitution, Policies and Procedures.

166.    As a result of the actions of the defendants, Mr. Elliott suffered damages, financial losses, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

167.    Mr. Elliott is entitled to punitive damages as a result of the actions by the PIAA and its representatives, Majikes and Schoen.


**III.     Elliott v. PIAA and Schoen – Violation of PIAA Assignment Policy**

168.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

169.     PIAA policy states assignors shall only use merit-based principles in the assignment of its officials. *See PIAA Policies and Procedures, at p.39-40.*

170.     PIAA policy states that it is committed to the equal treatment of officials.

171.     Pat Gebhart acknowledges the PIAA assignment policy to treat officials equally and fairly as well as using only merit-based principles to assign officials applies to all assignments, whether it be state playoffs, District playoffs, or regular season games.

172.     Schoen acknowledges the PIAA assignment policy applies to him in the assignment of regular season games, district playoff games, and the recommendation of officials to work state playoff games.

173.     As the official's representative, Schoen is responsible for creating a list of officials from District 2 to be considered for state playoff assignments.

174.     Schoen gives the list to the District 2 Chairman, who is responsible for forwarding the list to Pat Gebhart, who is responsible for the assignment of officials for state playoff games.

175.     Schoen has violated the PIAA assignment policy by not using merit-based principles when assigning regular season games, district playoff football games, district playoff basketball games, and recommending officials for state playoffs.

176.     Schoen has violated the PIAA assignment policy by not treating Mr. Elliott equally or fairly.

177.     Schoen has violated the PIAA assignment policy by retaliating against Mr. Elliott.

178.     As a result of the actions of the defendants, Mr. Elliott suffered damages, financial losses, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.


**IV.     Elliott v. PIAA and Schoen – Violation of PIAA assignment Policy**

179.     Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

180.     PIAA policy states that assignors shall not seek compensation from officials. *See PIAA Policies and Procedures, at p.39-40.*

181.     PIAA policy states that schools shall not use an assignor who seeks compensation from officials.  If compensation is to be paid, it shall come from the school.  *Id.*

182.     Compensation can be in the form of fees, non-cash benefits, or things of value.

183.     Schoen seeks compensation from officials in the form of votes & support in the official's representative election in exchange for assigning more games, higher quality games, playoff games, and recommending officials for state officials.

184.     Schoen has violated the PIAA Assignment policy by seeking compensation from officials that he assigns.

185.     An official's representative should be prohibited from being an assignor due to the appearance of impropriety and the ability to seek compensation or votes in exchange for the assignment of games.

186.     Additionally, as a result of Schoen receiving compensation from officials, Mr. Elliott was prevented from receiving a fair election and damaged in his candidacy for official's representative.

187.     Mr. Elliott suffered damages, financial losses, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

**V.     Elliott v. PIAA, Schoen and Majikes – Violation of PIAA Assignment Policy**

188.     Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

189.     Schoen is responsible for the assignment of officials for district playoffs and recommendation of officials for state playoffs but may delegate the responsibility.

190.     According to Schoen, he delegated the responsibility for the assignment of officials for the district basketball playoffs and finals to Joe Ross and Frank Majikes.

191.     According to Schoen, Joe Ross selects the officials from the Lackawanna League and Majikes selects the officials for the Wyoming Conference.

192.     Majikes was not delegated authority to assign officials from the Lackawanna League or preventing Joe Ross from assigning officials from Lackawanna League.

193.    Even though Schoen delegated his responsibility to assign officials for district finals to others, Ross and Majikes must still adhere to PIAA policy and base the assignments on merit and equal treatment of officials.

194.    Majikes violated the PIAA assignment policy by not using merit-based principles or treating Mr. Elliott equally and fairly by retaliating against Mr. Elliott and blocking him from working the district finals.

195.    Schoen violated the PIAA Assignment policy by failing to supervise and/or ensure that the officials he was elected to represent are treated equally and fairly and the assignments were based on merit.

196.    As a result of PIAA, Schoen and Majikes violating the PIAA assignment policy, Mr. Elliott suffered financial losses, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

## VI.    Elliott v. PIAA – Violation of Right to a Fair election

197.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

198.    Every two years, PIAA is responsible for holding an election for officials to elect their representative who will represent official's interests on the PIAA District 2 committee.

199.    Officials expect the process to elect their representative to be fair.

200.    PIAA confirms that the officials' right to elect their representative must be fair.

201.    The 2018 election for District 2 Official's Representative was not fair.

202.    In 2016, for the first time, PIAA used a form of electronic voting for the District 2 Official's representative election.

203.    To vote in the election, an official must receive an email from PIAA that has a link to the third party, Survey Monkey.

204.    If an official is listed as active or inactive, i.e., eligible, by their local chapter, he should receive an email.

205.    If an eligible official does not have an email listed with the PIAA, PIAA does not permit him to vote.

206.    If an eligible official has an email listed with PIAA but doesn't receive an email, the official will not have the opportunity to vote.

207.    If an ineligible official mistakenly receives an email to vote, the ineligible official will improperly have his vote counted in the election.

208.    Many officials were concerned and are still concerned that PIAA and its representatives, such as Schoen and Majikes, who is Vice President of the PIAA Board of Directors, have the ability to learn who the official voted for because PIAA controls the election process and can view the election results.

209.    However, Pat Gebhart informed officials that PIAA will not be involved in the election process and a third party, Survey Monkey, will conduct the election.

210.    Yet, PIAA controlled the entire election process and resulted in an unfair election.

211.    PIAA kept a list of officials who voted, who did not vote, who didn't open its email and who opened its email but did not yet vote.

212.    PIAA, not Survey Monkey, sent the emails to officials.

213.    PIAA did not send ballots to all eligible voters even a few attempts to send emails to all eligible voters.

214.    PIAA does not know whether all eligible voters received emails.

215.    PIAA does not know how many ineligible voters improperly received emails.

216.    PIAA, not Survey Monkey, controlled the questions asked in the election.

217.    PIAA determined what filters it selected in the election, including a filter that allowed the PIAA to see the answers to the two questions asked.

218.    PIAA prevented a large number of officials from voting who work solely in District 2, are members of the required local chapter in District 2, pay local chapter dues in District 2, and would have to have all their issues resolved in District 2.

219.   PIAA prevents officials who work in-state but reside out-of-state from participating in any district's election for official's representative.

220.   PIAA did not send email / ballot to eligible voters if they believed they had already sent a ballot, even if the email might have been sent to spam folders, and even if PIAA knew the official di did not vote in the election.

221.   PIAA sent emails / ballots to ineligible voters.

222.   On November 30, 2018, the day before the election, PIAA had a list of officials on its website who were eligible to vote, but the PIAA changed the eligible list after the election started to include officials who were not on the list and removed officials who were on the list.

223.   PIAA has no explanation for modifying the eligibility list during the election.

224.   Survey Monkey was limited to just counting the answers to the question.

225.   Survey Monkey provides customers with a free program or a fee-based program.

226.   Upon information and belief, PIAA receives well over $1 million dollars from officials, by way of annual dues and convention fees.

227.   Yet, PIAA used a free program to conduct the officials' representative election.

228.   The free program did not have the security protections that the fee-based program offered.

229.   PIAA failed to ensure the free Survey Monkey program was secure from the view of others.

230.   PIAA admitted it had at least two employees who had access to the PIAA Survey Monkey account and could view election results throughout the month-long election.

231.   Luke Modrovsky is a sports official in District 2 and served a summer internship a few months before the 2018 election with the PIAA.

232.   Modrovsky was recommended for the internship by PIAA Vice President of the PIAA Board and District 2 Chairman, Frank Majikes, who is a family friend of both Modrovsky's father and uncle, and also serves as Modrovsky's assignor.

233.    Schoen is Modrovsky's assignor for football games and upon information and belief has attempted to help Modrovsky to get on staff in college football.

234.    Upon information and belief, Modrovsky works college football games, but not as an on-field official, but as a timer or other event personnel, and Schoen assisted in getting him this work.

235.    During his PIAA internship, Modrovsky had access to the PIAA Survey Monkey account because he was responsible for conducting surveys and opinion polls of officials at the PIAA Convention using the PIAA Survey Monkey account.

236.    Modrovsky was given the PIAA password for the Survey Monkey account.

237.    PIAA only has one survey Monkey account.

238.    Upon information and belief, Modrovsky also had access to Survey Monkey through Wilkes University.

239.    Modrovsky used Wilkes University computers during the month of December 2018 to view the PIAA Survey Monkey account.

240.    Throughout the election in December 2018, Modrovsky viewed the PIAA District 2 election results on Survey Monkey.

241.    Modrovsky supported Schoen in the election.

242.    Modrovsky told supporters of Schoen that he was able to view the PIAA election results and provided them up-to-date results of the election.

243.    Modrovsky informed officials whom he believed supported Schoen that supporters needed to get more people to vote for Schoen because the election was close.

244.    Upon information and belief, these Schoen supporters and/or Modrovsky made Schoen and Majikes aware of the up-to-date election results.

245.    One such instance occurred at the Hazleton chapter basketball social in December 2018 when Modrovsky informed Chris Bayzick of the updated election results.

246.    Modrovsky informed Bayzick that he was able to view the PIAA election results from computers at Wilkes University.

247.     Mr. Elliott did not know Mr. Bayzick, who just retired as a Pennsylvania State Trooper in 2019.

248.     Mr. Bayzick contacted Mr. Elliott after Modrovsky informed him that he was monitoring the election results to benefit Schoen.

249.     Mr. Bayzick stated he did not believe it was fair that Modrovsky was improperly monitoring the election to impact the election.

250.     Modrovsky's actions were done to hurt Mr. Elliott.

251.     Modrovsky's actions had an impact on a very close election.

252.     Mr. Elliott informed PIAA that Modrovsky's was violating his right to a fair election by monitoring the election results and requested PIAA to investigate.

253.     Mr. Gebhart, who was Modrovsky's supervisor during his summer internship, told Mr. Elliott that his complaint was untrue, even before the PIAA investigated the complaint.

254.     Mr. Gebhart called Modrovsky and asked if he still had the PIAA password to the Survey Monkey account and if he viewed the election results during the election or told anyone of the election results.

255.     Modrovsky said no and the PIAA concluded their investigation believing Modrovsky was telling the truth.

256.     The 2018 PIAA District 2 Official's Representative election was not fair, and as a result of the actions and omissions by PIAA, and actions of Modrovsky and others, the election process was not fair in violation of PIAA Policies and Procedures.

257.     As a result of the actions by the defendants in violating PIAA Policy and Procedure, Mr. Elliott suffered harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.


**VII.     Elliott v. PIAA – Negligence**

258.     Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

259.     PIAA owed a duty to its officials and the candidates to ensure a fair election.

23

260.    PIAA breached its duty by using a free program, which did not provide security measures to prevent access or viewing of the results by others before the election ended.

261.    PIAA breached its duty by, upon information and belief, selecting a filter with Survey Monkey program that allowed them access to the votes and who the official voted for.

262.    PIAA breached its duty by allowing employees of PIAA to have access to the election results before the election concluded.

263.    PIAA breached its duty by controlling all aspects of the election process when it claimed it would not be involved.

264.    PIAA breached it duty when the Vice President of the Board of Directors openly support Schoen for the position of official's representative and informed others to vote for Schoen.

265.    PIAA breached its duty by failing to send ballots to all eligible voters.

266.    PIAA breached its duty by failing to ensure that officials who were entitled to vote received ballots to vote.

267.    PIAA breached its duty by failing to properly train, educate and/or supervise itds representatives and employees regarding their responsibilities and duties during an election.

268.    PIAA breached its duty by sending ballots to ineligible voters.

269.    PIAA breached its duty by not allowing all eligible voters to cast a vote in the election.

270.    PIAA breached its duty by failing to hold an adequate investigation when Mr. Elliott informed PIAA that the election process was unfair, that Modrovsky improperly viewed election results and informed others to assist Schoen in getting elected.

271.    The failure to hold a fair election adversely impacted Mr. Elliott and damaged Mr. Elliott in the election.

272.    As a result of PIAA Breaching its duty owed to the officials and Mr. Elliott, who was a candidate in the election, Mr. Elliott suffered harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

## VIII.   Elliott v. Luke Modrovsky

273.   Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

274.   PIAA acknowledges that Mr. Elliott, as a candidate for official's representative, was entitled to a fair election process.

275.   In fact, all District 2 officials are entitled to a fair election and expect the PIAA to ensure a fair election.

276.   Modrovsky intentionally interfered with Mr. Elliott's right and District 2 officials right to fair election for District 2 official's representative.

277.   Modrovsky had no privilege or justification to interfere in the election.

278.   Modrovsky's actions were intentional, malicious, outrageous, arbitrary, and capricious toward Mr. Elliott.

279.   Modrovsky acted with reckless indifference to the rights of Mr. Elliott and others in having a fair election.

280.   As a result of Modrovsky's intentional interference with Mr. Elliott's right to a fair election as guaranteed by PIAA, Mr. Elliott suffered damages, including, harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

## IX.   Elliott v. PIAA, Schoen Majikes and Modrovsky

281.   Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

282.   Upon information and belief, Modrovsky agreed with Schoen and/or Majikes that he would monitor the election results and provide the results to Schoen supporters, Schoen and/or Majikes, and Schoen and Majikes were aware of the up-to-date elections with the common purpose to benefit Schoen's re-election campaign.

283.   Modrovsky's monitoring of the election results was an unlawful act and had an unlawful purpose.

284.    Modrovsky accessed Survey Monkey to view the results of the election.

285.    Upon information and belief, Modrovsky communicated those results to Schoen, Majikes and/or Schoen supporters who made Schoen and Majikes aware of the results.

286.    As a result of this conspiracy, Mr. Elliott's right to a fair election was violated, and Mr. Elliott suffered harassment, impairment to his reputation, embarrassment, loss of enjoyment, severe mental anguish and emotional distress.

## X.      Elliott v. Modrovsky, Schoen, Majikes and PIAA

287.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

288.    The actions of the defendants to adversely affect Mr. Elliott's right to a fair election were done willfully, maliciously and without legal justification or excuse.

289.    The actions were done solely with the intent to harm Mr. Elliott.

290.    The actions of the defendants are outrageous, arbitrary, capricious, and malicious, and in violation of law and PIAA Constitution, Policies and Procedures.

291.    Mr. Elliott is entitled to punitive damages as a result of the actions of the defendants.

## XI.     Elliott v. PIAA and Schoen – Violation of PIAA Conflict of Interest Policy

292.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

293.    PIAA is governed by its Constitution, Bylaws, Policies and Procedures and these documents list rights of officials and responsibilities of the PIAA toward the officials.

294.    The PIAA Conflict of Interest policy states that each person serving as a member of the PIAA Board, District Committee, employees or agents of PIAA must perform their duties without even the appearance of impropriety. Each person must comply not only with the letter of the policy but the spirit of the law. *See PIAA Policies and Procedures, at p.2-3.*

295.    The policy states that when it is <u>possible</u> that a person serving as a member of the PIAA Board, District Committee, employee or agent of PIAA <u>may</u> have a conflict of interest due to his position or contacts, the person must report the conflict to the PIAA Board.

296.    Mr. Schoen is a PIAA representative, acts as an agent of the PIAA, serves on the PIAA District 2 Committee, and receives payment from the PIAA.

297.    Mr. Schoen must abide by the PIAA Conflict of Interest Policy and avoid even the appearance of a conflict of interest.

298.    Mr. Schoen must alert PIAA when it is possible that he may have a conflict of interest or may have the appearance of a conflict of interest.

299.    Mr. Schoen is in violation of the conflict of interest policy.

300.    Mr. Schoen never reported any of the following conflicts of interest to the PIAA.


**(A) Getting Paid by schools to Represent them as their Assignor**

301.    Schoen not only has the appearance of a conflict of interest, he has a direct conflict of interest by serving as the assignor for the Lackawanna League schools.

302.    Schoen has a direct conflict because he is paid to represent the schools as their assignor and unpaid to represent the officials in the district as their elected representative.

303.    The interests of the schools are contrary to the interests of officials.

304.    As Officials representative, Schoen is required to advocate for the best interests of the officials in District 2 and is their only voice on the District 2 Committee.

305.    As the paid representative for the schools, PIAA member schools require Schoen to assign officials to their football games in the Lackawanna League.

306.    Schools in the Lackawanna League vote to hire their football assignor every two years.

307.    To be hired as assignor, a person must apply to the league, and persuade a majority of the schools that he would best represent their interests with the officials.

308.     Additionally, the PIAA and the schools require Schoen to be compensated only by the schools and therefore, Schoen must verify that officials do not compensate him in any way.

309.     The schools want to ensure that they are the only ones paying the assignor and that the assignor is working only for their interests.

310.     A majority of the Lackawanna League schools voted to approve Schoen to be the assignor of football officials in their conference.

311.     Upon information and belief, Schoen has been the assignor of the football officials for approximately ten years.

312.     The officials representative is required to advocate the official's interests against the schools, which is whom officials have most of their competing interests, such as failure to get paid in timely manner, adequate change room and showering facilities, unruly fans or coaches, parking, and security to and from the game are some of the issues involving schools.

313.     The schools' assignor is required to look for the interests of the schools, not the officials.

314.     During his term as official's representative and assignor, officials have complained to Schoen about the above issues but Schoen has failed to advocate for the officials for fear that the schools would not vote to retain him as assignor.

315.     When schools lobbied PIAA to not have to pay officials before the game, as was the PIAA Policy, Schoen sided with the schools and against the officials, who clearly have an interest in getting paid at the game site.

316.     Being both the representative for the schools and the representative for the officials is a direct conflict of interest for Schoen

317.     Being both the representative for the schools and the representative for the officials gives the appearance of a conflict of interest.


### (B) Forced to assign some officials to the detriment of other Officials

318.     Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

28

319.    When Schoen assigns officials to work football games, he must select some officials to work games while also choosing some officials NOT to work games.

320.    Schoen also chooses some officials to work multiple varsity games during the week, while some officials never get the opportunity to work a single varsity game.

321.    By choosing some officials over other officials during the regular season, Schoen is not representing all officials in District 2 as he is required as District 2 Official's Representative.

322.    If a school directs Schoen not to send an official to their school, which has happened, he has a direct conflict in determining whose interests he will choose, the school or the official.

323.    Regardless of which interests he prefers or choose to advocate, the fact that Schoen has placed himself in this position to have his loyalty to the officials questioned gives the appearance of a conflict of interest.

324.    By choosing not to advocate for officials and/or side with schools, he has violated his duty to advocate for the officials and demonstrated a direct conflict of interest.


**(C) Using Assignments to Garner Support & Votes for Official's Representative Election**

325.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

326.    PIAA requires assignors to certify to PIAA member schools that the assignor does not assess a fee or receive compensation from officials in the assignment of their games.

327.    If there is a compensation to be paid to the assignor, the PIAA and its schools require only schools to give the assignor any form of compensation.

328.    Schools want to know their assignor is loyal to them (the paying customer), not the officials.

329.    If schools are paying the assignor to represent their interests, they have every right to expect loyalty if an issue occurs with a non-paying customers (officials).

330.    Compensation can be defined as monetary payments or non-cash benefits or thing of value.

331.     Although Schoen does not require officials to pay him cash for assigning them games, he does expect officials to compensate him by voting for him to be their official's representative.

332.     Schoen uses his position as assignor to seek votes and support of officials in the official's representative election by assigning them more games, multiple games in a week, higher quality games, district playoff games, state playoff games, or some other benefit to the official.

333.     Schoen seeks to be compensated from the officials who benefit from his assignments by requesting them to vote for him in the official's representative election.

334.     Schoen selects officials from outside the Scranton chapter (i.e., Luzerne County chapters) even when there are officials in Lackawanna County available to work.

335.     Schoen selects officials from Luzerne County who are leaders of their chapter and/or influential in their chapter in order to seek their support for re-election and influence others in their chapter to vote for Schoen.

336.     Schoen has never informed officials in the Lackawanna League that he selects officials from other District 2 chapters rather than use them for a Lackawanna League game.

337.     Schoen has shown through his years as an assignor that if you support Schoen, he will give you more games, higher quality games, playoff games, and/or recommend you for state playoff assignments.

338.     Schoen has also demonstrated to officials that If you don't show support for him or vote for him in the election, you are subject to a reduction in the number of games you are assigned, lower quality games, forced to travel long distances for the assignments, won't receive playoff games, and will not be recommended to work state playoff games.

339.     By using his position as assignor to garner votes and support at election time, Schoen is violating the PIAA assignment policy prohibiting any form of compensation from officials for assigning them games.

340.     Using his position as assignor to garner votes/support in his re-election as official's representative is also a conflict of interest as well as giving the appearance of a conflict of interest in his duties as official's representative.

**(D) Soliciting schools for Private work**

341.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

342.    Not only do schools pay Schoen to represent them to assign their games, schools pay Schoen's business to do private work for them.

343.    Schoen solicits schools in District 2 to do advertising, public relations, and other work for them.

344.    Schoen has never informed officials that he solicits work at schools while purporting to only represent officials.

345.    In his deposition, Schoen initially denied doing private work for schools only to admit that he did perform work for schools when confronted with work he did at several schools.

346.    Schoen acknowledged doing private work at most schools in Lackawanna County.

347.    Seeking private work and financial benefits from schools where he must advocate for the conflicting interests of officials is a direct conflict of interest for Schoen.

348.    Seeking private work and financial benefits from schools where he must advocate for the conflicting interests creates at least an appearance of a conflict of interest.

**(E) Getting paid by schools to represent them as a coach**

349.    Schoen also gets paid by the Scranton School District to represent West Scranton High School as their baseball coach.

350.    As a coach, Schoen has a duty to advocate for the best interests of his team and school.

351.    Schoen's duty and responsibility to seek the best interests for his team and school is in direct conflict with advocating for the best interest of the officials.

352.    At a minimum, the competing interests give the appearance of a conflict of interest.

353.    The competing interests as a coach and officials' representative is a direct conflict of interests.

354.    Additionally, it could give the appearance to opposing schools and coaches that the game will not be fairly officiated because Schoen represents the umpires.

355.    Schoen has never informed the officials of this conflict of interest or any conflict of interest.

356.    Schoen has never informed the PIAA of this conflict of interest or any conflict of interest as required by PIAA policy.

357.    Schoen cannot serve as PIAA Officials Representative with so many conflicts of interest with schools paying him and representing their interests.

358.    Schoen has violated the PIAA Conflict of interest policy by having so many conflicts of interests while serving as official's representative.

359.    Schoen has violated the PIAA Conflict of interest policy by failing to inform PIAA of possible conflicts of interest he may have.

360.    PIAA requires the PIAA official's representative to be free of even the appearance of a conflict of interest.

361.    Officials expect and are required to have an official's representative dedicated to them, loyal to their interests and avoid even the appearance of a conflict of interest.

362.    The officials have been damaged by Schoen's conflict of interest.

363.    As a result of a multitude of conflict of interests in violation of PIAA Policy and procedures, must be removed from the position.


**XII.    Elliott v. PIAA, Schoen and Majikes – Violations of Official's Representative Duties**

364.    Mr. Elliott incorporates by reference the averments contained in the paragraphs above.

365.    The PIAA has given the official's representative duties and responsibilities because the officials are an integral part of the purpose of the PIAA. *See Duties and Responsibilities of PIAA Official's representative.*

366.    The district official's representative has a duty to represent an official in any matter involving the PIAA and its member schools. *Id.*

367.    Officials rely on their official's representative to exercise his duties and responsibilities when they elect him to be their representative.

368.    The district chairman is not authorized to micro-manage PIAA Officials.

369.    According to Mr. Gebhart, Majikes is the most involved chairmen when it comes to selecting officials for the playoffs.


**(A) Assignment of District Playoff games**

370.    One of the most vital duties of an official's representative's is to identify the best officials during the year and reward them with playoff assignments.

371.    The district official's representative has a duty to give the list of names of the officials he recommends for district playoff games to the district chairman. *Id.*

372.    Schoen, however, admits that he has relinquished this vital responsibility to others, including Majikes, his boss on the District 2 Committee.

373.    Schoen claims that he is not involved in the selection of officials for district 2 basketball playoffs and finals.

374.    Schoen has not informed the officials that he has relinquished this responsibility.

375.    Schoen allows Majikes, the assignor of the Wyoming Valley Conference, and Joe Ross, assignor for the Lackawanna League, to select their respective officials for the district playoffs.

376.    Schoen stated that he delegated the duty to select district basketball playoff officials to Joe Ross and Frank Majikes with the understanding that Joe Ross will assign the Lackawanna League officials and Majikes will assign the Wyoming Valley conference officials.

377.    However, Majikes has gone beyond the authority delegated by Schoen and retaliated against Mr. Elliott, who is a Lackawanna League official assigned by Joe Ross, by informing Joe Ross that he cannot assign Mr. Elliott to do the district finals.

378.    Contrary to the authority delegated to Majikes by Schoen, Majikes believes he has the absolute authority to select any and all district playoff officials.

379.    Majikes claims to have authority to do whatever he wishes regarding the assignment of district playoffs because he always did it this way in the past.

380.    Majikes claims he is the only person who counts in assigning district playoffs.

381.    Majikes believes that even if Joe Ross and Schoen agreed to assign a Lackawanna official to work a district playoff game, he has the authority to prevent the Lackawanna League official from working the game.

382.    Majikes has usurped the authority the PIAA has given to official's representative.

383.    Even if Majikes granted himself dictatorial authority to be the only one who can select district playoff officials, he still must adhere to PIAA policy and select officials based on merit and treat all officials equally and fairly, rather than retaliating against officials.

384.    Majikes acted beyond the scope of his authority when he retaliated against Mr. Elliott to prevent him from working the district final.

385.    Schoen claims that he was unaware that officials recommended by the Lackawanna assignor were being precluded from working playoff games by Majikes.

386.    Schoen's claim of ignorance that Majikes is preventing Lackawanna League officials from working playoff games does not alleviate Schoen of his responsibility to make sure officials are selected in accordance with PIAA merit-based policy.

387.    Majikes' retaliation against Mr. Elliott preventing him from being assigned the district finals was in violation of PIAA Assignment policy.

388.    Schoen's failure to know his officials are being retaliated against by Majikes demonstrates that Schoen is derelict in his duties as officials representative.


### (B) Recommendation for state playoff games

389.    The district official's representative has a duty to give a list of officials he recommends for state playoff games to the district chairman, who then forwards those names to the PIAA. *Id.*

390.   The District Chairman has no authority to select officials who will be recommended to work state playoff games.

**(C) Selection of district interpreter**

391.   The district official's representative has a duty to select the name of the official that he recommends for district interpreter.

392.   The district official's representative then gives the name of the official he recommends for district interpreter to the district chairman, who forwards the name to the PIAA.

393.   The District Chairman has no authority to require the official's representative to form a committee, that must include the district chairman, to determine who will be the district interpreter.

394.   Yet, Schoen has allowed Majikes to usurp his duties and responsibilities by requiring the formation of a committee to select the district interpreter.

395.   The District Chairman has no authority, whether it be from PIAA or District 2, to require the official's representative to form a committee, that must include the Chairman, to select the interpreter.

396.   Schoen is in violation of his duties as official's representative by retaliating against Mr. Elliott.

397.   Schoen is in violation of his duties as official's representative by allowing Majikes to retaliate against Mr. Elliott

398.   Schoen is in violation of his duties as official's representative by allowing Majikes to usurp his duties and responsibilities as official's representative and micro-manage the officials.

WHEREFORE, Mr. Elliott prays for judgment against Defendants as follows:

a.   A permanent injunction against Defendants to cease any further retaliation against Mr. Elliott;

b.   A permanent injunction enjoining PIAA District 2 Chairman, Majikes, from usurping the responsibilities and duties of the official's representative as listed by PIAA, specifically, Majikes is prohibited from the selection of officials in district playoff games, state playoff games, and the district interpreter since those are the duties of

the Officials Representative;

c. A preliminary injunction staying the election results until conclusion of this litigation or order of court;

d. A declaratory judgment that the policies, practices and acts complained of herein, are unlawful, unconstitutional and in violation of PIAA Policies and Procedures.

e. A declaratory judgment that Mr. Schoen has conflicts of interests and shall be removed as official's representative;

f. A declaratory judgment that Mr. Schoen was in violation of his duties as official's representative and remove him as official's representative;

g. A declaratory judgment finding the defendants violated the PIAA Assignment policy;

h. A declaratory judgment finding the defendants violated Mr. Elliott's right to a fair election;

i. An Order cancelling the 2018 official's representative election and scheduling a new election for District 2 Officials' Representative;

j. Compensatory and punitive damages against Defendants for an amount in excess of $50,000,

k. Reasonable attorney fees, costs, and interest, and

l. Such other and further relief as the court may deem just and proper.

Respectfully submitted,


By: _____

JAMES R. ELLIOTT, ESQ.
P.A. Bar No. 78224
142 South Main Avenue
Scranton, Pa 18504
Phone: (570) 342-8200
Fax: (570) 342-7786

the Officials Representative;

c. A preliminary injunction staying the election results until conclusion of this litigation or order of court;

d. A declaratory judgment that the policies, practices and acts complained of herein, are unlawful, unconstitutional and in violation of PIAA Policies and Procedures.

e. A declaratory judgment that Mr. Schoen has conflicts of interests and shall be removed as official's representative;

f. A declaratory judgment that Mr. Schoen was in violation of his duties as official's representative and remove him as official's representative;

g. A declaratory judgment finding the defendants violated the PIAA Assignment policy;

h. A declaratory judgment finding the defendants violated Mr. Elliott's right to a fair election;

i. An Order cancelling the 2018 official's representative election and scheduling a new election for District 2 Officials' Representative;

j. Compensatory and punitive damages against Defendants for an amount in excess of $50,000,

k. Reasonable attorney fees, costs, and interest, and

l. Such other and further relief as the court may deem just and proper.

Respectfully submitted,

By: _____

JAMES R. ELLIOTT, ESQ.
P.A. Bar No. 78224
142 South Main Avenue
Scranton, Pa 18504
Phone: (570) 342-8200
Fax: (570) 342-7786

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of Plaintiff's Complaint upon the following via U.S. Mail, postage pre-paid:

Alan R. Boynton, Jr., Esquire
McNees, Wallace & Nurrick, LLC
100 Pine Street
Harrisburg, Pa 17101


Date: October 11, 2019                    By: _____

James R. Elliott, Esq.
142 South Main Avenue
Scranton, Pa 18504
Phone: (570) 342-8200
Fax: (570) 342-7786